## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

JOHN A. PALEN,

                **Plaintiff,**

     vs.

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,

              **Defendant.**

**CASE NO.  4:13CV3157**

**MEMORANDUM
AND ORDER**

John A. Palen filed a complaint on September 4, 2013, against Carolyn W. Colvin, the Acting Commissioner of the Social Security Administration. (ECF No. 1.) Palen seeks a review of the Commissioner's decision to deny his application for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq., and supplemental security income benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. The defendant has responded to Palen's complaint by filing an answer and a transcript of the administrative record.  (See ECF Nos. 7-9.)  In addition, pursuant to the order of Senior Judge Warren K. Urbom, dated November 13, 2013, (ECF No. 14), each of the parties has submitted briefs in support of his or her position. (See generally Pl.'s Br., ECF No. 17; Def.'s Br., ECF No. 22). After carefully reviewing these materials, the court finds that the Commissioner's decision should be affirmed.

### I. PROCEDURAL HISTORY

Palen, who was born on January 7, 1962, (tr. 58) filed his applications on January 31, 2011, and March 3, 2011. (Tr. 123-24, 125-30). He alleged an onset date of January 7, 2010. (Tr. 245). Palen's applications were denied initially on July 29, 2011, and on reconsideration on October 19, 2011. (Tr. 63-67, 78-82). Palen requested a

hearing before an administrative law judge (ALJ) on November 2, 2011, (tr. 89) and a hearing was held on May 18, 2012. (Tr. 29-56). On June 8, 2012, the ALJ found that Palen had not been under a disability from the alleged onset date through the date of the decision. (Tr. 11-28).

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. *See id.* Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i), (b). The ALJ found that Palen had not been engaged in substantial gainful activity since January 7, 2010, the alleged onset date. (Tr. 13). However, he had earnings in 2010 and 2011. The ALJ stated that Palen's work history since the alleged disability onset date illustrated his ability to sustain work. (Tr. 13).

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement." *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting."  20

2

C.F.R. § 404.1521(b). If the claimant cannot prove such an impairment, the ALJ will find

that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c).  The ALJ found

that Palen had the following severe impairments: coronary artery disease, degenerative

disc disease, major depressive disorder/bipolar disorder, personality disorder with anti-

social/narcissistic traits, and drug and alcohol abuse. (Tr. 13).

Step three requires the ALJ to compare the claimant's impairment or impairments

to a list of impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d); *see also* 20 C.F.R. Part

404, Subpart P, App'x 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). If the

claimant has an impairment "that meets or equals one of [the] listings," the analysis

ends and the claimant is found to be "disabled." *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d).

If a claimant does not suffer from a listed impairment or its equivalent, then the analysis

proceeds to steps four and five. *See* 20 C.F.R. § 404.1520(a). The ALJ found that Palen

did not have an impairment or combination of impairments that met or medically

equaled the severity of one of the listed impairments. (Tr. 14).

Step four requires the ALJ to consider the claimant's residual functional capacity

(RFC)[1] to determine whether the impairment or impairments prevent the claimant from

engaging in "past relevant work." *See* 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f). If the

claimant is able to perform any past relevant work, the ALJ will find that the claimant is

not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (f). The ALJ found that Palen was

unable to perform any past relevant work. (Tr. 20).

At step five, the ALJ must determine whether the claimant is able to do any other

work considering his RFC, age, education, and work experience. If the claimant is able

---

[1]   "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).

to do other work, he is not disabled. The ALJ found that Palen had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) and § 416.967(b), except he could not climb ladders, ropes, or scaffolds and could not work at unprotected heights or with dangerous unprotected machinery. He was limited to simple, routine, and repetitive tasks with a maximum SVP of two[2] and no more than occasional interaction with supervisors, co-workers, and the general public. He was limited to few changes in a routine work setting. (Tr. 16).

The ALJ found that Palen had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy. (Tr. 22). Therefore, Palen had not been under a disability from January 7, 2010, through the date of the decision. (Tr. 22). The Appeals Council denied further review on July 1, 2013. (Tr. 1-6). Thus, the ALJ's decision stands as the final decision of the Commissioner, and it is from this decision that Palen seeks judicial review.

## II. FACTUAL BACKGROUND

### A.    Medical Evidence

Palen asserted that he was disabled by his history of four heart attacks, a lower back injury, major depressive disorder, and bipolar disorder.

---

[2] "The [Specific Vocational Preparation] level listed for each occupation in the [Dictionary of Occupational Titles] connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. At SVP level one, an occupation requires only a short demonstration, while level two covers occupations that require more than a short demonstration but not more than one month of vocational preparation." *Hulsey v. Astrue*, 622 F.3d 917, 923 (8th Cir. 2010).

*1. Heart Attacks*

Palen's first heart attack occurred on April 25, 2009. (Tr. 548). Palen underwent a cardiac catheterization procedure and was discharged on April 29, 2009. (Tr. 542, 547). By May 12, 2009, Palen had returned to work full-time as a cook at Whiskey Creek, but he continued to smoke half a pack of cigarettes per day. (Tr. 520). Palen had no angina symptoms and was advised to continue with his current medications and to quit smoking. (Tr. 521).

Palen had another acute inferior myocardial infarction in August 2009. (Tr. 425). He went through another catheterization procedure and had a stent placed in an artery. (Tr. 419). At a two-week followup appointment, Palen was advised to avoid alcohol and smoking and to begin cardiac rehabilitation. (Tr. 420). He did not see a physician again until September 7, 2010, (tr. 518) when he reported that he continued to smoke, but he seemed fairly motivated to quit. Palen denied any chest discomfort, shortness of breath, or other heart concerns. (Tr. 518). He reported that he had not been taking heart medications because the drug assistance program had stopped providing them about four months after his procedure. He was directed to begin medications again. (Tr. 519).

In January 2011, Palen had another acute myocardial infarction. (Tr. 475). He underwent coronary arteriography with stent revascularization of his infarct-related coronary artery. (Tr. 275, 541). Treatment notes indicated that Palen would need long-term outpatient cardiac rehabilitation and continued antianginal therapy. (Tr. 286). Upon discharge, Palen was directed to follow a cardiac diet and to go to cardiac rehabilitation. (Tr. 476).

On February 10, 2011, Palen went to the emergency room after he had been vomiting for three or four hours and had passed out. (Tr. 512). The next day, he went to

his cardiologist and reported continued dizziness and lightheadedness. (Tr. 512). He was diagnosed with orthostatic hypotension, including vomiting, diarrhea, and weight loss, complicated by medication therapy. (Tr. 513). His medications were adjusted. (Tr. 513). A 24-hour heart monitor showed normal sinus rhythm and no significant arrhythmias. (Tr. 528). A week later, Palen reported feeling better and had no angina symptoms. (Tr. 510). Palen reported completing cardiac rehabilitation a month later. (Tr. 507). A cardiac stress test in July 2011 was negative for ischemia. It showed sinus bradycardia at rest. (Tr. 619). In August 2011, he was doing well with no angina symptoms or limitation in his daily activities. Palen was encouraged to pursue tobacco cessation and to add exercise to his regimen. (Tr. 662).

Palen went to the emergency room on January 26, 2012, for chest pain. (Tr. 724). He was diagnosed with angina, chest wall pain, esophageal reflux spasm, myocardial infarction, pericarditis, pleuritis, and pneumonia. (Tr. 722). A cardiac stress test on January 27, 2012, showed no evidence of obstructive coronary disease with inducible myocardial ischemia or findings of previous myocardial infarction. (Tr. 651).

One month later, Palen reported an occasional-to-rare dull ache in his chest which could occur when he was sitting. It did not wake him up at night. Palen remained active although he did not have a regular exercise plan. (Tr. 657). The chest pain was determined to be atypical and noncardiac in nature. (Tr. 658). His medications were adjusted and he was encouraged to stop smoking, but he stated he had no interest in becoming smoke-free at the time. (Tr. 659).

*2. Lower Back Injury*

Palen reported that he had back surgery in 1997 which resulted in the placement of five screws and two rods and a bone fusion. (Tr. 40-41, 244). He told the consultative

examiner that he had pain in his lower back if he was too active and that he had numbness in his right leg with activity, specifically bending and twisting. (Tr. 573). Palen testified at the hearing that he missed work when he had problems with his back. (Tr. 36). In February 2011, a CT scan of the cervical spine showed moderate degenerative disc disease C3 through C7. (Tr. 524). He took over-the-counter medication for pain. (Tr. 40). Palen stated that he had had no injections in his back or physical therapy since immediately after the surgery. He did not use a cane or walker. (Tr. 42).

*3. Mental Health Issues*

The record shows that Palen was hospitalized on several occasions for alcohol abuse or mental health concerns. In February 2010, he was admitted to the Behavioral Health Unit at Faith Regional Health Services in Norfolk, Nebraska, when he reported that he was an alcoholic. (Tr. 401). His GAF[3] upon admission was 25. (Tr. 402). Palen had been living in a three-quarter-way house, but when he was advised he would no longer be able to stay there, he became suicidal and relapsed on alcohol. He reported a previous relapse in November 2009 after he lost his job. Prior to that he had been sober for 15 months. Palen was stabilized on medication and individual and group psychotherapy, and he participated well in all activities. His mood was good and his affect was appropriate. (Tr. 396). He was medically and psychiatrically stable at the time of discharge after three days in the hospital. He was directed to followup for medication

---

[3] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental-health illness.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 937 n. 1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994) (hereinafter DSM-IV)). A GAF between 21 and 30 indicates serious impairment in communications or judgment or an inability to function in all areas. DSM-IV-TR at 34).

management and encouraged to attend Alcoholics Anonymous (AA) and seek individual counseling. (Tr. 397).

Between July 11 and 16, 2010, Palen was in the hospital in Kearney, Nebraska, after he voiced suicidal thoughts and depression. (Tr. 241). His GAF upon admission was 35.[4] (Tr. 244). Palen reported three prior suicide attempts by overdosing with medications, the last in 2004, and four previous admissions to psychiatric hospitals. (Tr. 241, 243). Palen took part in individual and group counseling. He exhibited significant mood improvement and was considered stable. His GAF upon discharge was 60.[5] He was discharged to a substance abuse program in Norfolk. (Tr. 241).

In a drug and alcohol abuse evaluation while hospitalized, Palen stated that he had been sober between October 2008 and January 2010, but when he lost his job he began drinking and gradually progressed to drinking daily up until he sought treatment. He was in treatment for two weeks, walked away, had a relapse, and then became suicidal. (Tr. 250). Palen stated that he was first diagnosed with depression in 1986. (Tr. 251). He stated he had been to residential programs nine times and had recently been seeing a therapist on an outpatient basis. (Tr. 251). Palen indicated that when he began to feel successful, he tended to relapse and sabotage the success. It was recommended that he attend intensive outpatient treatment as well as following up with AA or Narcotics Anonymous (NA). (Tr. 252).

Palen was admitted to the hospital again on July 23, 2010, after he went to the police department and reported that he was suicidal. (Tr. 358). He reported that he used

---

[4] A GAF between 31 and 40 indicates major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. DSM-IV-TR at 34.

[5] A GAF between 51 and 60 indicates moderate symptoms or any moderate difficulty in social, occupational, or school functioning. DSM-IV-TR.

alcohol to numb pain he had from his teeth. (Tr. 358). Palen stated he did not have money for needed dental procedures. (Tr. 366). His blood alcohol level on admission was .270. By the time he was admitted to the hospital, he denied current suicidal or homicidal ideation and denied any symptoms of psychosis. (Tr. 358). He was stabilized on medication and individual and group psychotherapy, and his mood improved. He was diagnosed with alcohol dependence, major depressive disorder, recurrent by history, and personality disorder, not otherwise specified. His GAF was 53. (Tr. 358). He was discharged after 10 days and was medically and psychiatrically stable. (Tr. 359).

A chemical dependency evaluation completed while Palen was in the hospital noted that Palen had previously received treatment, lived at a halfway house, relapsed, received treatment, and relapsed again and was asked to leave. Palen said he had a difficult time following the rules and staying sober. Palen said he would binge drink for four to five days and then would be sober for four to five days. He left another treatment program after two weeks because he could not get along with residents or staff and he was having suicidal thoughts. He was placed at Richard Young for treatment for six days. (Tr. 366).

At the time, Palen was unemployed. He reported he was fired from Taco John's after he threatened to call the corporate office regarding his garnishments. He lost another job at ABM Janitorial when he went to treatment. He owed $28,000 in back child support and 65 percent of his income was being garnished for it. He stated he felt helpless and hopeless about the debt. (Tr. 366).

It was recommended that Palen be stabilized in inpatient care and participate in therapy services. (Tr. 367). His symptoms of helplessness and hopelessness needed to be examined and improved prior to discharge. Following discharge, it was

9

recommended that he participate in a long-term treatment program. However, Palen reported that he hated people and had a history of not getting along with others, which interfered with his treatment potential. If he was unable to take part in group therapy because of his dislike of others, it was noted that individual therapy might be the best option, but there were also significant risks associated with individual therapy due to his chronic alcohol use and psychosocial stressors. (Tr. 367).

On August 17, 2010, Palen was again admitted to the hospital after he reported that he had relapsed and started smoking marijuana and methamphetamine on August 6, 2010, and started drinking alcohol on August 15, 2010. (Tr. 334). He voluntarily went to the Behavioral Health Unit, reporting a depressed mood, poor sleep, low energy, crying spells, hopelessness, and helplessness. He stated that the first thing he thought about in the morning was alcohol and that he had been very unsuccessful in trying to cut down on alcohol. (Tr. 334). His GAF upon admission was 30. (Tr. 339). He was stabilized on medication and individual and group psychotherapy. He was discharged on September 2, 2010, to Catholic Charities and was medically and psychiatrically stable with a GAF of 59. (Tr. 334-35).

On September 22, 2010, Palen was admitted to the hospital after he attended an AA meeting and then took an overdose of several medications. (Tr. 317). He was stabilized with medications and individual and group psychotherapy. His affect was appropriate and his insight and judgment appeared adequate. (Tr. 317). His GAF was 57. Palen was discharged after seven days and advised to followup with a physician for medication management. He declined an appointment with a therapist. (Tr. 318).

Teresa Reinhart, PMHNP, BC, completed a psychiatric evaluation of Palen on December 15, 2010. (Tr. 490). Palen reported that his depression started when he was

10

26. He reported that he had been depressed every day for the last two weeks and felt hopeless and depressed more days than not for the previous two years. He took medication to help him sleep. He suffered with anhedonia. Palen said he preferred to sleep all day and had to force himself to eat. He had poor motivation. He had attempted suicide twice in the last year and two times prior to that. (Tr. 490). In the previous year, Palen had been hospitalized for mental health issues three or four times. (Tr. 491). He stated that he had tried 15 different antidepressants, but nothing seemed to change. He started drinking alcohol at age 12 and then progressed to heavy drinking when he was in his early 20s. He had three periods of sobriety, ranging from three months to three years. (Tr. 491). Reinhart's diagnostic impression was bipolar I, obsessive-compulsive disorder, nicotine and alcohol dependence, and cannabis abuse. His GAF was 50.[6] (Tr. 493).

On March 15, 2011, Palen went through an initial evaluation with a psychiatrist, Tayo Obatusin, M.D. (Tr. 559). Palen reported that he was doing extremely well despite his medical problems. He described his mood as stable, denied any anxiety, and had an appropriate affect. He was diagnosed with bipolar disorder, not otherwise specified, nicotine and alcohol dependence, and methamphetamine abuse. His GAF was 59. (Tr. 559).

Palen continued to see Dr. Obatusin for medication management and followup. (Tr. 558). In March 2011, Palen reported he was mildly depressed and stressed by financial difficulties and unemployment. He felt frustrated because disability had not

---

[6] A GAF between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school financing. DSM-IV-TR.

been approved. Palen confirmed that he was noncompliant with some of his medications. (Tr. 558). His GAF was 57. (Tr. 558).

In April 2011, Palen reported that he was frustrated because he had not been able to get a job and was having financial difficulties, but he denied any depressive symptoms. (Tr. 556). He had appropriate affect and his GAF was 58. (Tr. 556). In May 2011, Palen reported poor appetite, depressed mood, and poor concentration. He had been noncompliant with his medications at least two to three times per week. Palen denied any current suicidal or homicidal ideations. He had appropriate affect and his GAF was 59. (Tr. 555).

In July 2011, Palen complained of mild depressive symptoms. He said he was stressed from the loss of his job two weeks earlier. Palen stated that he would be going to jail, possibly in the next week, for failure to pay child support. He reported fair appetite and low energy, but he denied suicidal or homicidal ideations. He had appropriate affect, and his GAF was 60. (Tr. 554). In August 2011, Palen reported that he was sad because he had not been able to pay his child support. His stressors were loneliness and chronic mental illness. Palen had started working two weeks earlier. His affect was blunted, and his GAF was 65.[7] (Tr. 673).

In September 2011, Palen's community support worker reported that Palen was doing extremely well. He had two part-time jobs, described his mood as stable, and his appetite had improved. His GAF was 70. (Tr. 672). In October 2011, Palen's mood was

---

[7] A GAF between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functions pretty well and has some meaningful interpersonal relationships. DSM-IV-TR at 34.

stable and his affect was appropriate. His GAF was 75.[8] (Tr. 671). In November 2011, Palen reported his mood was stable. He was struggling to work part-time. (Tr. 670).

In January 2012, Palen described his mood as better, but he stated that he had some depression secondary to loneliness over the holidays. Palen said he took his medication about 90 percent of the time. He stated that he had not been following up with his therapist because of financial difficulties. He was smoking 15 cigarettes a day. His GAF was 75. (Tr. 668). A few weeks later, Palen reported that he was compliant with his medications and was working at a grocery store. He was not attending AA or NA, but he denied any craving for drugs or alcohol. (Tr. 667). In March 2012, Palen reported that he had missed his medications three times in the last week. His mood was stable and he had appropriate affect. It was recommended that Palen begin individual psychotherapy as soon as he was financially stable. (Tr. 666).

On April 5, 2012, Palen was admitted to the hospital after he relapsed on alcohol. (Tr. 708). His GAF was 30, and his blood alcohol level was .295. (Tr. 674, 678). He had poor appetite, low energy, crying spells, and was helpless. He was also concerned that he might lose his job. His mood was euthymic. (Tr. 708). When he was discharged on April 9, 2012, his GAF was 55. He had participated in group, individual, and milieu therapy and was involved in relapse prevention therapy. Palen was no longer imminently dangerous to himself or others. (Tr. 674-75). He had appropriate affect. (Tr. 677).

---

[8] A GAF between 71 and 80 indicates that if symptoms are present, they are transient and expectable reactions to psychosocial stresses, no more than slight impairment in social, occupational, or school functioning. DSM-IV-TR at 34.

**B.      Medical Opinion Evidence**

John J. Curran, Ph.D., completed a psychological interview on June 22, 2011. (Tr. 561). Palen reported that he was looking for work after having lost a job in fast food after he missed a couple of days without calling in. (Tr. 564). He reported that he had worked more than 100 jobs, but he quickly became unhappy with the job and missed work. He was able to take care of himself and dress and feed himself. (Tr. 564). Palen stated that his last use of alcohol was in October 2010. (Tr. 565).

Curran stated that Palen exhibited a broad range of affect in the interview. (Tr. 567). There was a restriction of activities of daily living. When depressed, Palen reported being tired and sleeping much of the day. He complained of poor concentration, but he did quite well in the mental status exam. He demonstrated difficulties in maintaining social functioning. Curran stated that Palen appeared to have the ability to sustain concentration and attention needed for task completion. He had the ability to understand and remember short and simple instructions. He did not have the ability to carry them out under ordinary supervision. He would need frequent rest breaks and a supportive supervisor. He had the ability to relate appropriately to coworkers and supervisors and to adapt to changes in his environment. (Tr. 568). Curran diagnosed Palen as having alcohol dependence in early full remission, bipolar I disorder, and nicotine dependence. (Tr. 568). His current GAF was 55 and the highest GAF in the past year had been 68. (Tr. 569). Curran stated that Palen's prognosis was difficult to estimate because it was dependent on his sobriety. If Palen maintained his sobriety, his functioning would be better and he would follow through with routine medical care. The medications he was taking did not seem to be treating his depression very well. Curran recommended that Palen take part in individual therapy. (Tr. 569).

14

Ryan Clauson, M.D., conducted a consultative examination on June 27, 2011. (Tr. 572). The report noted that Palen had applied for disability for the second time. Palen reported that he continued to have chest pain at rest, which could occur every couple of minutes. (Tr. 572). Palen stated he had pain in his lower back if he was too active. He also had numbness in his right leg with activity, specifically bending and twisting. (Tr. 573). Palen reported that he had been on at least 20 different medications for bipolar disorder and major depressive disorder. Palen said he had not had alcohol in a couple of months. He smoked four cigarettes a day. (Tr. 573). He was not working, but was looking for employment. (Tr. 574). His affect was flat. Palen had normal ambulation and gait and could get on and off the examining table. He had some pain in the lumbar spine while being tested for range of motion. (Tr. 574). His cervical spine showed normal range of motion. (Tr. 575). He was able to walk on his toes and heels and to squat. (Tr. 576). Dr. Clauson stated that Palen had no limitations in using his upper and lower extremities. He was able to sit for approximately 20 minutes and could stand for long periods of time. His walking, lifting, and bending over were somewhat limited because his right leg began to hurt. He could carry objects weighing up to 15 to 20 pounds. He appeared to have good dexterity. He could hear and speak well and would be able to travel. (Tr. 577).

On June 27, 2011, Patricia Newman, Ph.D., completed a mental RFC assessment. (Tr. 582-84). She determined that Palen had no limitations in understanding and memory. In the area of sustained concentration and persistence, the only moderate limitation was in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 582). Newman stated that Palen had a history of substance abuse and absenteeism from

15

employment and would have moderate limitations in maintaining a schedule. (Tr. 584). In the area of social interaction, Palen had no limitations in the ability to ask simple questions or request assistance, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. He had moderate limitations in the ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. (Tr. 583). Palen noted that he had difficulty with people and personality disorder features. However, he responded appropriately with his treating sources and was able to attend treatment programs and run errands. (Tr. 584). Palen had no limitations in the ability to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, or to set realistic goals or make plans independently of others. (Tr. 583).

Newman also completed a psychiatric review technique on June 27, 2011. (Tr. 587-601). She indicated that Palen had medically determinable impairments but they did not precisely satisfy the diagnostic criteria for affective, personality, or substance addiction disorders. (Tr. 590-95). Newman determined that Palen had mild limitation in activities of daily living, and moderate limitations in maintaining social functioning and maintaining concentration, persistence, or pace. (Tr. 597). There was insufficient evidence of any episodes of decompensation. (Tr. 597). Newman stated that Palen was considered partially credible because he was not completely forthcoming about his alcohol use. (Tr. 598).

A.R. Hohensee, M.D., completed a physical RFC assessment on July 27, 2011. (Tr. 603-11). He stated that Palen could occasionally lift and/or carry up to 20 pounds

16

and could frequently lift and/or carry up to 10 pounds. (Tr. 604). He could stand and/or walk and sit for about six hours in an eight-hour workday. (Tr. 604). He was unlimited in the ability to push and/or pull. (Tr. 604). He could frequently climb and balance, and occasionally kneel, crouch, and crawl. He could only occasionally climb a ladder. (Tr. 605). He had no manipulative, visual, or communicative limitations. (Tr. 606-07). He should avoid concentrated exposure to extreme cold and heat, humidity, and fumes and odors because of early chronic obstructive pulmonary disease. (Tr. 607). He had no restrictions related to moisture, noise, or vibration. (Tr. 607). Dr. Hohensee noted that a consultative examination provider suggested limitations consistent with light work. (Tr. 609). Dr. Hohensee noted that the evidence did not indicate any frequent back pain and he believed Palen's back condition was stable. (Tr. 610). The evidence suggested Palen had done well since the last heart attack and stent placement. The pain reported during the consultative examination was atypical. The general physical examination was basically normal and Palen was noted to have range of motion in all major joints. Dr. Hohensee stated that Palen should be capable of limited work as noted in the RFC assessment. (Tr. 610).

On October 13, 2011, Linda Schmechel, Ph.D., completed a psychiatric review technique. (Tr. 640-41). She stated that Palen reported poor concentration, but he did well on an examination. He had good cooperation and expressed himself well on examination. Although a physician suggested Palen would need frequent breaks and a supportive supervisor, Schmechel said the need for frequent breaks was not well supported. Evidence suggested Palen had an ability to carry out simple instructions without extra supervision. She affirmed the mental health RFC and psychiatric review technique of June 7, 2011. (Tr. 641).

Glen Knosp, M.D., completed a physical RFC assessment on October 14, 2011. (Tr. 642). Dr. Knosp stated that there was no indication that Palen could not sit longer than 20 minutes as suggested by Dr. Clauson because Palen was able to sit longer during the psychological consultative examination. Dr. Knosp affirmed the RFC of July 27, 2011. (Tr. 642).

## C.   Hearing Evidence

At a hearing on May 18, 2012, Palen stated that he became disabled on January 7, 2010. (Tr. 33). At the time of the hearing, he was working about 25 hours per week at Bomgaar's, where he cleaned, painted, and put out freight. (Tr. 35). He was allowed to lift between 15 and 20 pounds. He had worked there for nine months and earned $7.55 per hour. (Tr. 35). Palen said he missed seven to eight days of work a month because he got stressed or had problems with his back. (Tr. 36). He had lost his driver's license in 2007, but he had not tried to get it back because he could not afford it. (Tr. 36).

Palen shared his work history. Since January 2010, Palen said he had worked as a cook, in which he occasionally lifted 40-pound bags of food, but he tried to have someone else lift them. (Tr. 36-37). Palen said he was fired because he missed a number of days of work. (Tr. 37). He said he had worked temporarily in a factory making seats. He was fired from his job as a prep cook at Whiskey Creek Steakhouse after he had words with the manager. (Tr. 37). Palen had worked as a technician at Houses of Hope in Lincoln, Nebraska, where he oversaw the house and bought groceries. (Tr. 38). He lifted grocery bags up to 30 pounds. He left the job when he moved to Columbus, Nebraska. He had worked in construction when he built hog confinements. He lifted up to 100 pounds, but he left because it was too much physical strain. Palen said he could not work full-time because he missed work when he was stressed, from his back, or

18

from chest pain after having had four heart attacks. (Tr. 38). He said physicians had told him not to lift more than 15 to 20 pounds. (Tr. 39).

Palen said he took medications for bipolar and major depressive disorders and for heart disease. (Tr. 40). Palen said the medications did not help, but he had no side effects from them. Palen said he had constant pain in his back from simple day-to-day bending, lifting, and twisting. He took over-the-counter pain medications. (Tr. 40). He said he had chest pain almost all the time, shortness of breath, and was fatigued very easily. (Tr. 40). Palen said he had three stents in his heart, but had no bypass surgery. (Tr. 41).

Palen said his mental problems manifested themselves when he was stressed and could not keep his mind on what he was doing. He said he was stressed by day-to-day life and there was no one thing that caused his depression. (Tr. 42). When his depression began, he could not be around people so he stayed in his apartment and did not go anywhere. (Tr. 43). In the last month, he had been depressed for three weeks. He did not go to any kind of therapy because he had no insurance and could not afford it. He said he was trying to quit smoking and probably smoked about a fourth of a pack each day. Palen said he had last drunk alcohol more than 30 days previously. There was an isolated incident in which he drank for a couple of days because of his depression and he ended up in the hospital psychiatric ward for five days. (Tr. 43).

Palen said he could sit about 15 minutes, and he did not have a problem with standing. He could walk about 15 minutes. (Tr. 44). Palen said he had problems getting along with other people, including authoritative figures and coworkers, because he did not take direction well. (Tr. 44, 49) When criticized, he talked back, and that had caused him to lose jobs. (Tr. 50). In a typical day, Palen said he worked three hours in the

morning and then spent a good share of the day at the Liberty Center, which is a daytime rehabilitation center for people with mental illness. Then he went home and watched television. (Tr. 45). At the Liberty Center, he helped cook, helped with decorations, or helped with whatever needed to be done. (Tr. 45). He fixed microwave meals, but also said he did not have much of an appetite. (Tr. 46). Palen said he did the laundry once a week and vacuumed or swept a couple of times a month. (Tr. 46). About the only time Palen left his apartment was to go to work or to the Liberty Center. (Tr. 46). Palen said he had no hobbies. (Tr. 47).

The ALJ asked Gale Leonhardt, vocational expert (VE), whether an individual with the following restrictions could perform any of Palen's past jobs: restricted to light work, could not climb ladders, ropes or scaffolds, could not work at unprotected heights or with dangerous, unprotected machinery, was limited to simple, routine and repetitive work, with only occasional interaction with supervisors, coworkers and the public, and few changes in the routine work setting. (Tr. 53). Leonhardt stated that such an individual could work in fast food because it was light and unskilled. (Tr. 53). Leonhardt identified other jobs that Palen could work at: production assembler, light and unskilled; hand packager, light; and housekeeping cleaner, light and unskilled. Leonhardt said there were 1,928 jobs as production assembler in the four-state region of Iowa, Nebraska, Missouri, and Kansas, and 40,998 jobs in the United States. There were 14,148 jobs as hand packager in the four-state region and 311,534 jobs in the United States. There were 16,638 jobs as housekeeping cleaner in the four-state region and 366,755 jobs in the United States. (Tr. 54). If the hypothetical individual was restricted to sedentary work, he or she could work as a hand packager, which also existed at the sedentary, unskilled level. There were approximately 1,000 jobs in the four-state region

and 21,485 jobs in the United States. The individual could also work as an office helper, which is a sedentary, unskilled job that had 4,645 jobs in the region and 96,041 jobs in the United States. (Tr. 54). The individual could work as an information clerk, which was sedentary and unskilled with 3,613 jobs in the region and 83,237 jobs in the United States. (Tr. 54-55). Leonhardt stated that a person with the marked limitations identified by Dr. Obatusin would not be able to be competitively employed. (Tr. 55).

**D.    Additional Evidence**

Palen stated that he stopped working on August 26, 2010, although he believed his condition had become severe enough to keep him from working on January 7, 1988. (Tr. 153). On a supplemental disability report completed on February 25, 2011, Palen said he is not very sociable and has to force himself to visit others, except he spent time at the Liberty Center where he could talk about his mental illness. When he was depressed, he did not leave his apartment, but there were days when he could leave because of the manic part of the bipolar disorder. (Tr. 188). He said most of his family stayed away from him and he had no close friends. Palen stated he did not get along with people at all, or if he did, it was superficial depending on the day and where his mental illness took him. He said most people did not like him. Palen said he prepared microwavable meals, did the dishes every other day, did laundry about every other week, and cleaned about every seven to 10 days. (Tr. 188). Palen stated that he did no outside chores because of his heart attacks and physical strain on his lower back. (Tr. 189). He stated he did his own errands. Palen said he had no hobbies. (Tr. 189). He said he had problems getting to sleep and staying asleep. (Tr. 190). Palen stated that his heart attacks left him with little energy and his mental illness caused him not to care

21

about anything unless he was on the manic side. He said his dislike of being around people made it hard to find and keep a job. (Tr. 190).

### III.  STANDARD OF REVIEW

This court must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997) (quoting *Clark v. Chater*, 75 F.3d 414, 416 (8th Cir. 1996)).  *See also Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011). "Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the conclusion." *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome."  *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action."  *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  *See also Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

This court must also determine whether the Commissioner's decision "is based on legal error."  *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)).  "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law."  *Id.*

22

(citations omitted).   No deference is owed to the Commissioner's legal conclusions. *See Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003).   *See also Collins*, *supra*, 648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

## IV.   ANALYSIS

### A.   Opinion of Dr. Obatusin

Palen argues that the ALJ erred in failing to accept as controlling the limitations and restrictions placed on him by Dr. Obatusin, Palen's psychiatrist. (Pl.'s Br. at 9). Palen asserts that the ALJ dismissed Dr. Obatusin's opinion while placing greater value on the opinions of the state agency psychologists who had no professional contact with him, did not hear him testify, and did not have access to all the medical records in the case. (Pl.'s Br. at 12).

Dr. Obatusin completed a mental impairment evaluation on November 21, 2011. (Tr. 644-50). He stated that Palen had bipolar disorder that was moderate to severe, had been present for more than one year, and was expected to last for more than one year. The impairment caused Palen to be unable to perform his previous job. (Tr. 644). Dr. Obatusin stated that Palen's condition had improved in nine months of treatment, but Palen's prognosis was guarded. Dr. Obatusin stated that Palen was not a malingerer. (Tr. 645). Dr. Obatusin stated that Palen had moderate limitations in the ability to complete a normal weekday and workweek without interruptions from psychologically based symptoms, to interact appropriately with the general public, and to ask simple questions or request assistance. (Tr. 648). Palen had marked limitations in the ability to make simple work-related decisions, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without

23

distracting them, and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 648). Palen had moderate limitations in the ability to set realistic goals or make plans independently of others. Dr. Obatusin stated that Palen had marked limitations in the ability to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, and to travel in unfamiliar places or use public transportation. (Tr. 649). Dr. Obatusin stated that Palen could work from zero to three days per week. (Tr. 649). He stated that Palen needed approval for social security disability to prolong his life, avoid malnutrition, and enable him to pay his co-pay. (Tr. 650).

The ALJ gave little weight to Dr. Obatusin's opinion, finding it inconsistent with Dr. Obatusin's treatment notes that showed very high GAF scores. In addition, the ALJ noted that disability is not awarded because an individual needs financial help, but instead is awarded to assist individuals who are unable to perform any job. (Tr. 19).

An ALJ must give a treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009), *citing* 20 C.F.R. §§ 404.1527(d)(2), 416.927 (d)(2). If the opinion fails to meet these criteria, however, the ALJ need not accept it. *Brace*, 578 F.3d at 885. An ALJ is warranted in discrediting some of the treating physician's opinions, in light of other inconsistent or contradictory evidence in the record. *Weber v. Apfel*, 164 F.3d 431 (8th Cir. 1999).

"When one-time consultants dispute a treating physician's opinion, the ALJ must resolve the conflict between those opinions." *Cantrell v. Apfel*, 231 F. 3d 1104, 1107 (8th Cir. 2000). Generally, the report of a consulting physician who examined a claimant

24

once does not constitute substantial evidence upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician. *Id.*, *citing Lanning v. Heckler*, 777 F.2d 1316, 1318 (8th Cir.1985). However, there are two exceptions.

An ALJ's decision to "discount or even disregard the opinion of a treating physician" will be upheld where other medical assessments "are supported by better or more thorough medical evidence," or "where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Cantrell v. Apfel*, *supra* (internal citations omitted).

An ALJ has the duty, at step four, to formulate the claimant's RFC based on all the relevant, credible evidence of record, including medical records, observations of treating physicians and others, and an individual's own description of his limitations. *McKinney v. Apfel*, 228 F. 3d 860, 863 (8th Cir. 2000). The ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians. *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011).

The ALJ found that Palen's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Palen's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible because they were inconsistent with the RFC assessment. (Tr. 16). Palen testified that chest pain prevented him from working. However, the ALJ noted that Palen had received infrequent treatment for his cardiac condition and the records did not corroborate his alleged limitations. Palen had a heart attack in April 2009 and underwent angioplasty and stent placement. (Tr. 16). At his two-week checkup, he was doing well. He did not return to his cardiologist until September 2010. He stopped taking

25

medication after the drug assistance program stopped paying for it. He exercised and walked two to three miles twice a week. He had another heart attack in January 2011 and again underwent a cardiac catheterization and stent placement. (Tr. 17). His cardiologist noted that Palen remained angina free during a July 2011 mildly abnormal stress test and he had no limitations in his daily activities. In January 2012, Palen complained of chest pain, but a stress test was normal without evidence of obstructive coronary disease. In February 2012, Palen reported occasional-to-rare aching in his chest of short duration about once per week. His cardiologist noted that his recent chest pain was atypical and noncardiac and highlighted Palen's recent negative stress test. (Tr. 17).

Palen also testified to back pain, but the ALJ found that Palen rarely sought medical attention for back pain. When hospitalized for psychiatric issues in July 2010, he complained of chronic back pain, but it was very mild. Palen stated that he occasionally took ibuprofen for pain. A February 2011 CT scan of his cervical spine showed moderate degenerative disc disease from C3 to C7. He walked with an upright posture and a quick and steady gait. He had walked to his consultative examination. (Tr.17).

Dr. Obatusin's treatment notes were inconsistent with his opinion. During the time Palen was undergoing treatment, Dr. Obatusin assigned GAF scores ranging from 57 to 80. At Palen's initial evaluation in March 2011, he reported that he was doing extremely well and denied any anxiety. (Tr. 559). He reported mild depression and stress from financial difficulties. (Tr. 558). In April 2011, Palen denied any depressive symptoms, and Dr. Obatusin noted that Palen's affect was appropriate. (Tr. 556). In May 2011, Palen reported poor appetite, depressed mood, and poor concentration. He

had been noncompliant with his medications at least two to three times per week. (Tr. 555). Palen continued to complain of mild depressive symptoms and stress from the loss of a job in July 2011. (Tr. 554). In August 2011, Palen reported that he was sad because he had not been able to pay his child support. (Tr. 673). But in September 2011, Palen's community support worker reported that Palen was doing extremely well. (Tr. 672). In October 2011, Palen's mood was stable and his affect was appropriate. (Tr. 671). In January 2012, Palen described his mood as better. (Tr. 668). By March 2012, Palen's mood was stable and he had appropriate affect. (Tr. 666). On several occasions during treatment, Palen reported that he had been noncompliant with his medications. (Tr. 666). Thus, the treatment notes do not support Dr. Obatusin's medical source statement indicating that Palen had marked limitations.

The ALJ gave great weight to Dr. Clauson's opinion because it was consistent with his examination and with the medical record. (Tr. 17). The ALJ also gave great weight to the opinion of Dr. Hohensee, who opined that Palen could perform light work, and the opinion of Dr. Knosp who affirmed Dr. Hohensee's opinion. The ALJ stated that their opinions were based on an objective review of the entire medical record, the experts were experienced in assigning RFCs and evaluating impairments, and their opinions were consistent with the record and testimony. (Tr. 17). The ALJ gave great weight to the opinions of Newman and Schmechel because they objectively reviewed the entire medical record, were experienced in assigning mental RFCs and evaluating mental impairments, and their opinions were consistent with the record and testimony. (Tr. 19). The ALJ gave little weight to the opinion of Dr. Curran because it was not consistent with more recent evidence that showed that Palen's condition had improved. (Tr. 19).

27

An ALJ evaluates the findings of State agency psychological consultants as medical opinions under the regulations. *See* 20 C.F.R. §§ 404.1527, 416.927(f)(2). In this case, the ALJ found that the consultants' opinions were internally consistent and consistent with the evidence as a whole, and therefore, gave them substantial weight. Social Security Ruling 96-6p provides that, "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."

The ALJ also reasonably considered that Palen's reported daily activities were inconsistent with Dr. Obatusin's opinion. Palen stated that he prepared microwave meals, did dishes and laundry, and cleaned. (Tr. 188). At the hearing, he testified that he worked, went to the Liberty Center, watched television, did laundry, mopped, and did grocery shopping. (Tr. 45-46). Palen's reports of social functioning were also inconsistent with Dr. Obatusin's opinion that he had marked limitations. Palen reported that he talked to his daughter on the telephone almost daily. (Tr. 563). He was able to maintain a friendship with a woman. (Tr. 563). An ALJ is warranted in discrediting some of the treating physician's opinions which are inconsistent with, and contradicted by, other evidence in the record. *Weber v. Apfel*, 164 F.3d 431 (8th Cir. 1999).

In addition, Palen's work history is inconsistent with Dr. Obatusin's opinion that he has disabling limitations. Palen earned $3,950 in 2011 and $2,380 in 2011. (Tr. 135-36, 206-09, 220-23). His supervisors at part-time jobs in 2010 and 2011 stated that the quality and quantity of Palen's work was sufficient to meet and satisfy demand. (Tr. 206, 220). Palen showed the ability to understand, remember, and carry out short and simple instructions. (Tr. 206-07, 220-21). He could maintain attention and concentration for

extended periods and perform at a consistent pace. (Tr. 207, 221). Palen could relate appropriately to supervisors and coworkers and he could make simple, work-related decisions and adapt to changes in the work. (Tr. 207-08, 221-22). However, one employer reported that Palen could get stressed out and miss work for a few days. (Tr. 207). Two months before Dr. Obatusin's opinion was written, Palen's community support worker stated that he was doing extremely well. (Tr. 672). At the hearing in May 2012, Palen testified that he had been working 25 hours each week since the previous fall. (Tr. 35).

"[T]he ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011), *quoting Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). The record in this case shows that the ALJ properly evaluated and weighed all of the medical opinions and evidence and determined that Dr. Obatusin's opinion was not supported by the record. The ALJ was correct in failing to give Dr. Obatusin's opinion greater weight.

**B. Ability to Work**

Palen also mentions that the case must be remanded because the vocational expert testified that a person with Palen's limitations could not perform any past relevant work and could not work in the national economy. (Pl.'s Br. at 17).

Leonhardt, the VE, was presented a question describing the limitations of a hypothetical individual with restrictions similar to those of Palen. (Tr. 53). Leonhardt stated that Palen could work as a production assembler, hand packager, or housekeeping cleaner. There were a sufficient number of jobs in those areas in the region and the nation. If the hypothetical individual was restricted to sedentary work, he

or she could work as a hand packager, as an office helper, or as an information clerk. (Tr. 54). However, Leonhardt stated that a person with the marked limitations identified by Dr. Obatusin would not be able to be competitively employed. (Tr. 55).

The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). The Commissioner may satisfy this burden through the testimony of a VE. *See* 20 C.F.R. §§ 401.1566(e), 416.966(e). Although the VE stated that a person with limitations as defined by Dr. Obatusin would not be able to perform any gainful employment, as noted above, the court finds that Dr. Obatusin's opinion should not be given great weight. The ALJ was justified in relying on the VE's testimony as substantial evidence to find that Palen was not disabled. *See* 20 C.F.R. §§ 404.1566(e), 416.966(e). The VE's testimony was supported by the record as a whole.

The ALJ also found that Palen's credibility was reduced due to its inconsistencies with the medical record. Palen stated that he last used marijuana 15 to 20 years ago and had never used any other illegal drugs, but he reported using marijuana somewhat regularly during the alleged period of disability, had a positive urine drug screen for marijuana, and reported using methamphetamine in August 2010. In addition, he left multiple treatment programs before completion and declined treatment with a therapist. On multiple occasions, he stopped taking his medications. The ALJ found that the lack of compliance suggested that Palen's condition was less severe than alleged. (Tr. 20).

The ALJ stated, "If the claimant in this case chooses not to follow through with a substance abuse treatment program, not to consistently attend treatment, and not to take his medications as prescribed, that is his privilege but the [Social Security Agency]

30

will not subsidize this behavior." (Tr. 20, citing *Sias v. Secretary of Health and Human Services*, 861 F.2d 475 (6th Cir. 1988).

## V.   CONCLUSION

For the reasons discussed, the court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed. Accordingly,

IT IS ORDERED:

1.     The Commissioner's decision is affirmed;

2.     The appeal is denied; and

3.     Judgment in favor of the defendant will be entered in a separate document.

Dated this 1st day of July, 2014

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge

31